# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRENDA MARGESON,** *et al.* **,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:12-00052** |
| | ) | **Judge Sharp** |
| **WHITE COUNTY, TENNESSEE,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This civil rights action arose after James Margeson was fatally shot by White County Sheriff's Department deputies during the execution of a capias warrant. Defendants have moved for summary judgment on the entirety of Plaintiffs' claims.

## I. FACTUAL BACKGROUND

Over the course of several years, Mr. Margeson had trouble with the legal authorities in White County. Such troubles included run-ins with the Sheriff's Department relating to the manufacture (or attempted manufacture) of methamphetamine, and contact with the Department of Children's Services ("DCS") regarding the welfare of his and Plaintiff Brenda Margeson's children.[1]

At some point in 2004 or 2005, DCS took custody of the Margesons' first child because of pending domestic assault charges against Mr. Margeson, and because he had failed a drug test.

---

[1] The facts are drawn primarily from Defendants' statement of undisputed facts and Plaintiffs' responses thereto. In setting forth the facts, the Court notes that, particularly with respect to Mr. Margeson's interactions with the White County Sheriff's Department and DCS, Plaintiffs concede many of the facts, but claim they are not relevant. The Court is of the view that some recitation of those background facts is necessary to place the events at issue in this case in context.

When the Margeson's second child was born in March 2006, DCS immediately took custody of that child as well. DCS's involvement in the lives of the Margesons continued until Mr. Margeson's death, during which time the department periodically took custody of the children.

On July 3, 2010, Mr. Margeson began serving time at the White County Jail on charges of intent to manufacture methamphetamine. Prior to beginning his sentence, the Margesons decided that they should get divorced and, upon his release in January 2011, Mr. Margeson went to live with his father.

In late January 2011, DCS again took custody of the Margeson children because Mr. Margeson had violated a protective order preventing him from contacting his children without approved supervision. Mrs. Margeson gave birth to their fifth child on February 16, 2011, and DCS took immediate custody of this child at the hospital. The Margesons did not have custody of their children at the time of Mr. Margeson's death.

In late June or early July 2011, DCS changed the goal for the Margeson children from reunification with the parents to adoption. The Margesons were informed by DCS that it was going to petition to terminate their parental rights.

Depressed at the prospect of losing his children, Mr. Margeson turned to drugs to lessen his pain. He also began mentioning to family and friends that he would have the police kill him, believing that his death would bring the children back into their mother's custody. In fact, in the weeks leading up to his death, Mrs. Margeson observed that her husband's behavior was "spiraling out of control," which she attributed to the fact that they were going to lose their parental rights.

On June 23, 2011, Mr. Margeson was arrested on a charge relating to the manufacture of methamphetamine. A hearing date was set for July 1, 2011, and then reset for July 22, 2011. He

was also due in court on July 20, 2011, on a prior charge related to methamphetamine.

Prior to his scheduled court dates, Mr. Margeson told his wife that he was not going to appear as ordered because, if he did, he knew he would be placed in jail. True to his word, Mr. Margeson did not appear as required either on July 20, or July 22, 2011.

On July 21, 2011, Mr. Margeson carried a pistol under his shirt and, Mr. Margeson told his wife (or she came to believe) that if the police came to get him, he might pull his gun out. Mrs. Margeson told him that if he did that, the police would shoot him. Mr. Margeson said he knew that, but it was a part of life, or something to that effect. In the days leading up to his final encounter with the police, Mr. Margeson also told his wife on three or four occasions that she did not need to worry, he would not be around much longer, and Mrs. Margeson could move on with her boyfriend.

On July 22, 2011, the Margesons were at Rita Brock's residence.[2] Mrs. Margeson awoke to find Mr. Margeson drinking coffee.[3] He reiterated that he was not going to court.

Later that morning, the Margesons walked to Mr. Margeson's aunt's house for breakfast. While en route, Mrs. Margeson noticed that Mr. Margeson had a pistol in his front pocket.[4] At breakfast, Mrs. Margeson heard someone ask Mr. Margeson if he wanted the cops to shoot him, to which he responded, "that is a part of life." When told by one or more of the people at breakfast that he had to go to court or the police would come to arrest him, Mr. Margeson stated that the police would have to take him out in a body bag.

---

[2] Ms. Brock is Mr. Margeson's mother.

[3] Either that morning or the morning before, Mrs. Margeson saw her husband at the table with a "long gun" and cartridge. She later described the gun to police as an "AK".

[4] This is what Mrs. Margeson told the Tennessee Bureau of Investigation ("TBI") three days after the shooting. In her deposition, Mrs. Margeson conceded that she made the statement, but claimed that she did not recall seeing a gun, only that she could see Mr. Margeson had something under his shirt.

Concerned by the comments Mr. Margeson made, and also by her son's behavior in the previous days, Ms. Brock went to the White County Sheriff's Department to speak with Defendant Sheriff Oddie Shoupe. Ms. Brock told the Sheriff that her son had said that if he could not see his children, the cops would have to take him out in a "body bag." She also informed the Sheriff that there were guns in the home.

After speaking with Ms. Brock, Sheriff Shoupe learned that the General Sessions Court for White County had issued a capias/bench warrant for Mr. Margeson's arrest for failure to appear. The warrant also indicated that Mr. Margeson was to be held without bond.

Meanwhile, the Margesons went back to Ms. Brock's house. Mr. Margeson laid down on the couch and placed his handgun under a pillow. An SKS assault rifle was under the couch.

At her husband's insistence, Mrs. Margeson locked the doors. She then laid down with him and waited for him to go to sleep so that she could take the guns away. At this point, the Margesons probably knew police would come to arrest Mr. Margeson because the "bonds lady" had texted him and told him that a bench warrant had been issued.

Sheriff Shoupe assembled a group of officers to execute the warrant, informing them of Ms. Brock's statements about her son being armed and not willing to come peacefully. Officers were also shown a picture of Mr. Margeson. Those officers then drove to the Church of Doyle where they met other officers. Sheriff Shoupe told those assembled not to use their assault rifles for fear of injuring neighbors. The officers then went to Ms. Brock's house to execute the warrant.

Upon arrival, several officers approached the front of the house, others went to the back of the house, still others set up a perimeter, and one officer remained in the driveway to provide cover if necessary. Meanwhile, Mrs. Margeson heard a car pull up and opened the front door where she

was met by Defendant Detective Craig Capps.

Upon seeing Detective Capps, Mrs. Margeson turned towards her husband and told him "it was the cops." She was then instructed to open the door and put her hands up.

In a statement to the TBI, Mrs. Margeson said that when the Sheriff's Department vehicles pulled into the driveway, her husband jumped up and grabbed his guns, and that he was shot after he pointed a gun at the officers.[5] In her deposition and in another statement given to the TBI, however, she stated that she did not see her husband with a gun, although she concedes that she told her husband, "please don't do this. I love you."[6] She was then pulled out of the doorway by Detective Capps, and heard her husband say, "let her go."

Detective Capps claims that as he turned back, he saw Mr. Margeson pointing a rifle. Sheriff Shoupe similarly claims that after Mrs. Margeson was pulled off the porch, Mr. Margeson came into the doorway and pointed a gun at Defendant Detective Chris Isom. It is undisputed that sometime during this period one or more officers yelled "show me your hands," "drop the gun," "get down," or words to that effect.

Detective Isom claims that upon seeing a rifle pointed at him, he fired one shot. Defendant Detective Richard Lynch also claims that after he saw Mr. Margeson pointing a rifle, he feared for his life and opened fire. Defendant Detective Joseph Williams did not see Mr. Margeson when the shooting started, but he, too, fired shots at Mr. Margeson. Defendant Detective Tommy Simmons claims that he saw Mr. Margeson holding a rifle and that shots were fired when the gun was raised.

---

[5] Specifically, Mrs. Margeson told TBI Agent Dan Friel in an interview immediately after the shooting that "James pointed her [sic] gun at the officers and that is when they shot him."

[6] In her deposition, Mrs. Margeson stated that what she meant by this statement was that her husband should not "do anything stupid."

Officers Lynch, Isom, Capps, and Shoupe claim that after shots were fired, Mr. Margeson fell to the floor and came up with a handgun. He then dropped the handgun and slid it to the side. The total number of shots fired is hotly disputed, as is the number of times Mr. Margeson was hit.[7]

After the shooting, Defendant Capps entered the home and removed the weapons before administering first aid. Defendant Lynch also entered the home, handcuffed Mr. Margeson, and assisted in administering first aid. The officers on the scene claim that while first aid was being administered, Mr. Margeson made statements to the effect of "I made you do it" and "I couldn't do it myself."

Mr. Margeson was taken by ambulance to an elementary school. He was then transported by helicopter to a hospital where he later died from his gunshot wounds.

When the shooting stopped, Mrs. Margeson began fighting with deputies in an effort to get to her husband. She was then placed in the back of a patrol car where she made the statement to Agent Friel that Mr. Margeson jumped up and grabbed a gun after the police vehicles pulled into the driveway.

The TBI and the White County District Attorney were tasked with investigating the shooting. The District Attorney found no misconduct and the TBI closed its file without finding any wrongdoing.

Based upon the foregoing, Mrs. Margeson, as next of kin and on behalf of the Margesons' five minor children, filed suit in this Court. Plaintiffs bring individual and municipal liability claims

---

[7] In fact, the Court ordered supplemental briefing on this issue, but the supplemental briefs hardly clarify the matter.

under 42 U.S.C. § 1983, as well as state law claims for assault and battery, and the intentional and negligent infliction of emotional distress. Named as Defendants are White County, Shoupe, Simmons, Capps, Lynch, Isom, Williams, as well as White County Sheriff's Department officers Nicholas Dunn, Daniel Trivette, and Robert Pike all of whom were at the scene of the shooting.[8]

## II.  STANDARD OF REVIEW

The standards governing summary judgment are well known and, for present purposes, it suffices to highlight the following:  A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P.  56(c); Covington v. Knox Cnty. School Sys., 205 F.3d 912, 914 (6th Cir. 2000).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.  APPLICATION OF LAW

The Complaint is in five counts.  Count I contains federal claims against the individual Defendants; Count II contains municipal liability claims against White County; Count III alleges state law claims against the individual Defendants; and Count IV seeks relief against White County based upon the state law claims asserted against the individual Defendants.[9]

---

[8]  The Complaint also names John Doe and Jane Doe Defendants.  Plaintiffs concede that the claims against the Doe Defendants should be dismissed.

[9]  Count V is not a substantive count, but rather a request for punitive damages based upon the Defendants' allegedly egregious and unconscionable conduct.

## A. **Federal Claims**

### *1. Individual Liability Claims*

In Count I, each of the individual Defendants is sued for excessive force, the "deprivation of liberty and property without due process of law," "freedom from summary punishment," and the failure to intervene.[10]  Defendants assert they are entitled to qualified immunity on each of these claims.

Qualified immunity is an affirmative defense which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   Generally, the qualified immunity inquiry involves first determining whether a constitutional violation occurred, and, if so, a subsequent determination of whether the right infringed was clearly established.  Saucier v. Katz, 533 U.S. 194, 202 (2001); McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005).[11]

Because Plaintiffs claim that Defendants used excessive force, "the relevant question is whether the officers' use of force complied with that allowable under the Fourth Amendment."  Simmonds v. Genesee Cnty., 682 F.3d 438, 444 (6th Cir. 2012).  "Any claim of excessive force is evaluated under the objective standard of 'whether the officers' actions are 'objectively reasonable'

---

[10]  All but the failure to intervene claims are properly characterized as excessive force claims.  See, Wells v. City of Chattanooga, 2011 WL 2749563 at *3 n.7 (E.D. Tenn. July 14, 2011); Brown v. City of Philadelphia, 2008 WL 269495 at *11, n.6 (E.D. Pa. Jan. 29, 2008).  Accordingly, the Court views Count I as containing essentially two claims – excessive force and failure to intervene.

[11]While this sequence "is often appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).  Instead, courts should use "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Id.

in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)).

In making the objectively reasonable determination, the Court looks at "1) the severity of the crime, 2) whether the suspect poses an immediate threat to the safety of the officer or others, and 3) whether he is actively resisting arrest or attempting to evade arrest by flight." Ciminillo v. Streicher, 434 F.3d 461, 467 (6th Cir. 2006). These factors are not exhaustive, however, because,

> the ultimate question is "whether the totality of the circumstances justifies a particular sort of seizure." St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005) (quoting Graham, 490 U.S. at 396). Furthermore, reasonableness must be judged from the perspective of a reasonable officer on the scene, not with the 20/20 vision of hindsight. See Terry v. Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir. 2002).

Id.

"Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness," and "the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994). Thus, while a "court may be hesitant to doubt [an officer's] testimony . . . 'the court may not simply accept what may be a self-serving account by the police officer," but "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story.'" Jefferson v. Lewis, 595 F.3d 454, 462 (6th Cir. 2010) (citing Scott, 39 F.3d at 915). This includes looking at "contemporaneous statements by the officers" and considering "whether officer's story is internally consistent and

consistent with other known facts.'" <u>Scott</u>, 39 F.3d at 915.[12]

Plaintiffs argue that summary judgment is inappropriate on their excessive force claims because there is a question of fact as to whether Mr. Margeson had a weapon in his hands and/or was pointing a weapon at the officers when he was shot. However, Plaintiffs have not created a genuine issue of material fact on this question.

On the one hand, "[i]t has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'" <u>King v. Taylor</u>, 694 F.3d 650, 664 (6th Cir. 2012) (citation omitted) (colleting cases). On the other hand, "[w]hen a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death," and "[a] police officer need not wait for a suspect to open fire on him, much less wait for the suspect to actually hit him, before the officer may fire back." <u>Greathouse v. Couch</u>, 433 F. App'x 370, 373 (6th Cir. 2011).

In determining whether Mr. Margeson posed a threat of serious harm, the focus is from the reasonable officers' perspective. <u>Livermore *ex rel.* Rohm v. Lubelan</u>, 476 F.3d 397, 405 (6th Cir. 2007). Here, all of the officers in a position to see – including Shoupe, Capps, Isom, Lynch and Simmons – have consistently stated that Mr. Margeson was pointing a rifle at officers when he was shot.

In an effort to create a genuine issue of material fact, Plaintiffs point to the statements and/or testimony of several other officers and Mrs. Margeson. However, even granting Plaintiffs the

---

[12] Reading Plaintiffs' papers was, as Yogi Berra is alleged to have said, "like déjà vu all over again" because the foregoing paragraphs setting forth the analysis for excessive force, as well as its application to deadly force cases, comes directly from this Court's opinion in <u>Eibel v. Melton</u>, 904 F. Supp.2d 785, 804-05 (M.D. Tenn. 2012). The exact same language appears in Plaintiff's response brief without any attribution.

indulgence required by Rule 56, there simply is no competent evidence to create a jury question on whether, at the time of the shooting, Mr. Margeson was in possession of a weapon and posed an immediate threat of harm to the officers.

Plaintiffs note that Defendant Whitson stated that "he never saw Mr. Margeson with a gun." (Docket No. 40 at 9). This is hardly remarkable because Whitson was involved in pulling Mrs. Margeson across the yard when the shots rang out. He was not involved in the shooting, nor in a position to see whether Mr. Margeson had a gun.

Plaintiffs also observe that "Deputy Williams stated that he never even saw Mr. Margeson before he (Deputy Williams) started shooting . . . let alone saw Mr. Margeson with a gun." (Id.). True, but Williams also testified that he was outside of the front window offering protection to the officers in the yard, that he fired a shot when he thought officers were being fired upon, and that, after seeing Isom pull away from the door, he stepped to his right, saw Mr. Margeson's shoulder, and fired again. This testimony simply does not establish that Mr. Margeson did not have a gun, only that Williams was not in a position to see it.

Plaintiffs also point to Defendant Trivette's testimony at a preliminary hearing during which he stated that he did not see Mr. Margeson with a gun. However, in response to the question, "you never saw him come to the door with a gun, did you?" Trivette merely responded, "No, I personally didn't." (Docket No. 47-1 at 30). In his deposition he explained that he "didn't see Mr. Margeson until he was in the ambulance." (Docket No. 34-7 at 7). Again, this evidence does nothing to show one way or the other whether Mr. Margeson was armed at the time of the shooting.

Finally, Plaintiffs point to Mrs. Margeson's deposition testimony in which she stated that when she got up and went to answer the door, she saw her husband stand up but did not see a gun in his hands at that time. Nevertheless, and leaving aside her statement to Agent Friel immediately

11

after the shooting, Mrs. Margeson conceded in her deposition that she "cannot say one way or the other" whether her husband pointed a rifle at the officers at the time the shooting started. (Docket No. 34-2 at 110). Again, this evidence cannot be read as establishing that Mr. Margeson was unarmed when he was shot.

While the Court is unconvinced that there is a genuine factual issue as to whether Mr. Margeson was armed with a rifle when the officers opened fired, the Court is also of the opinion that factual issues exist as to whether the amount of force used was necessary. As the Court pointed out in its Order requesting supplemental briefing, the number of shots fired can be significant. Compare Abbott v. Sangamon Ctny., 705 F.3d 706, 733 (7th Cir. 2013) ("To be sure, an officer will not be held liable if the circumstances under which the force was used evolved so rapidly that a reasonable officer would not have had time to recalibrate the reasonable quantum of force") with Brockington v. Boykins, 637 F.3d 503, 507-08 (4th Cir. 2011) ("it is just common sense that continuing to shoot someone who is already incapacitated is not justified" and, based upon facts in the case, "thirty-three shots would be unjustified, as would twenty-nine, or even nineteen [and] six is too many"). After all, the law is clearly established that police officers cannot engage in gratuitous violence. See McCaig v. Raber, 515 F. App'x 551, 555 (6th Cir. 2013) (collecting cases). Ultimately, the question is whether, "allow[ing] for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation," the number of shots fired was objectively reasonable from the perspective of a reasonable officer on the scene. Graham, 490 U.S. at 397.

That question simply cannot be answered from the record before the Court. It is entirely unclear how many shots were fired, or how many shots struck Mr. Margeson. Nor is it clear how

12

many volleys of shots were fired.

Defendants contend that only two volleys were fired. They also contend that the number of shots was 15, based upon the fact that the TBI recovered five shotgun hulls and ten shell casings at the scene. They also argue that, while the autopsy report shows Mr. Margeson was shot a total of 21 times, that number does not accurately reflect the separate shots that hit Mr. Margeson because most of the officers were using shotguns loaded with .00 buckshot, some wounds may have been double-counted as both entry and exit wounds.

Plaintiffs place the number of shots fired at somewhere between 36 and 43, with 20 or 21 hitting Mr. Margeson. This is based upon the autopsy report and a TBI report which logged 23 bullet holes in the residence.

None of the parties have presented competent evidence to support their reading of the autopsy report, and this Court's review suggests that a definitive conclusion cannot be drawn from the report itself. In addition to the report, a dashboard camera from a patrol car on the scene has been submitted, but that does not clarify the number of shots fired either. From the Court's repeated review, the tape appears to capture what may have been a shot, followed by a pause, four equally spaced shots, followed by a pause, twelve equally spaced shots, and perhaps even more shots after yet another pause. Given the cadence, it seems doubtful that the evenly spaced shots are from shotgun blasts, as opposed to a pistol.

It may well be, that regardless of the number, all of the shots fired were necessary because Defendants claim that Mr. Margeson dropped his rifle after the initial volley and reached for a pistol. Specifically, in their Statement of Undisputed Facts, Defendants assert that when "Mr. Margeson fell to the floor . . . he came up with his handgun, which he then drops and slides away." (Docket No. 41 at 27, SOF ¶ 80). However, even assuming this is true, and assuming that only two volleys

were fired, it does not explain the necessity of twelve evenly spaced shots. This is something the participants need to explain to a jury.[13]

Based upon the foregoing, summary judgment will not be granted on Plaintiffs' excessive force claim as to the officers who fired shots at Mr. Margeson, specifically Defendants Lynch, Isom and Williams. Summary judgment will be granted with respect to the remaining Defendants because "[t]o establish liability against an individual defendant acting under color of state law, a plaintiff must show that the defendant was 'personally involved' in the use of excessive force." Burley v. Gagacki, 729 F.3d 610, 619 (6th Cir. 2013).

In so ruling, the Court recognizes Plaintiffs' evident desire to hold Sheriff Shoupe accountable, but there is no evidence that he fired a shot, even though he is "the captain of the ship," as Plaintiffs put it. (Docket No. 40 at 15). " To be liable, a supervisor must have 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" Jones v. Sandusky Cnty., 2013 WL 5992087 at *12 (6th Cir. Nov. 12, 2013) (quoting Hays v. Jefferson Cnty., 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" Id. Plaintiffs have not shown Sheriff Shoupe engaged in, or acquiesced in, the alleged excessive force; mere presence at the scene is insufficient to establish supervisory liability. Caudell v. City of Loveland, 226 Fed. App'x 479, 482 (6th Cir. 2007).

---

[13] In general, "witness credibility is a jury function," Burley v. Gagacki, 729 F.3d 610, 622 (6th Cir. 2013), and determining whether the amount of force used, vis-a-vis the number of shots fired was reasonable, will require assessing credibility, weighing the evidence, and drawing legitimate inferences from the facts, all of which "are jury functions, not those of a judge." Anderson, 477 U.S. at 255; see, Hinojosa v. Butler, 547 F.3d 285, 294 (5th Cir. 2008) ("A review of the record, however, makes plain that the fate of [plaintiff's] excessive force claim turned on credibility; whether the jury believed that [defendant] used excessive force against [plaintiff] turned on the extent to which [defendant's] characterization of [plaintiff's] behavior, and the threat he posed, was credible").

Although the Court will deny summary judgment as to some Defendants on the excessive force claim, the Court will grant summary judgment on the "failure to intervene" claim against all Defendants.

The law surrounding a failure to intervene claim has recently been summarized by the Sixth Circuit as follows:

> "This court has held . . . that a police officer who fails to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Floyd v. City of Detroit, 518 F.3d 398, 406 (6th Cir. 2008) (internal quotation marks omitted). In this circuit's first clear endorsement of "failure to intervene" liability under § 1983, Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982), we found that officers could be held liable under § 1983 for standing by idly while other officers repeatedly beat and kicked a suspect and dragged him down an alley. We have also made clear, however, that officers cannot be held liable under this theory if they do not have "a realistic opportunity to intervene and prevent harm." Ontha v. Rutherford Cnty., Tenn., 222 F. App'x 498, 507 (6th Cir. 2007).

Wells v. City of Dearborn Heights, 2013 WL 4504759 at *6 (6th Cir. Aug. 26, 2013).

Plaintiffs make no arguments, let alone direct the Court to any evidence, which would suggest that, once the initial shots were fired in response to the immediate threat of harm, there was a reasonable opportunity for officers to intervene and prevent further harm. While the Court has found that a question of fact exists as to whether a second (or perhaps third) round of shots was necessary, this does not mean that, once the initial shots were fired, officers on the scene should have anticipated another volley of shots if, in fact, Mr. Margeson no longer posed an actual threat.

### 2. Municipal Liability Claims

Plaintiffs sue White County and the individual Defendants in both their individual and official capacities. Claims against local officers in their official capacities are essentially suits against the governmental entity that employs them. Everson v. Leis, 556 F.3d 484, 493 n.3 (6th Cir.

2009).

In <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978), the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." However, "municipalities may be held liable under § 1983 when the injury inflicted is a result of 'a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" <u>Radavansky v. City of Olmstead Falls</u>, 395 F.3d 291, 311 (6th Cir. 2005) (quoting <u>Monell</u>, 436 U.S. at 694).

In response to Defendants' Motion for Summary Judgment, Plaintiffs argue that "Sheriff Shoupe makes decisions based on aggression and encourages the same in his deputies." (Docket No. 40 at 13). For that statement, Plaintiffs point to his deposition testimony in another case where he stated that he uses the force necessary to make an arrest and makes sure his "'deputies go home every night,'" and where he conceded he hit a handcuffed suspect "as many times as [he] could.'" (<u>Id</u>., citing, <u>Judd v. White County</u>, No. 2:09-00076 (M.D. Tenn. 2009), Shoupe Dep. at 75-76 & 84). The fact that Defendant Shoupe wants his officers to go home at night is probably more laudable than sinister, and Plaintiffs' suggestion that a passive suspect was beaten may be misleading because Shoupe further explained that the suspect was actively fighting, restraints or not. Regardless, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under <u>Monell</u>." <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985).

Plaintiffs also argue that municipal liability should be imposed for failure to train. They write: "[r]egarding training, it became apparent through the proof taken in this case that the deputies did not have the necessary training to address a situation like the one they were confronted with in the case at bar." (Docket No. 40 at 14). The only "proof" they cite in support is Defendant

Williams' testimony that his only "specialized training" was "a tactical methamphetamine clan [sic] lab entry class." Id.

Even though "[t]he courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability," Gregory v. City of Louisville, 444 F.3d 725, 753 (6th Cir. 2006), "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," Connick v. Thompson, 131 S.Ct. 1350, 1359 (2011). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton v. Harris, 489 U.S. 378, 390-91 (1989). "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Id. at 392. Therefore, and because any "lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983," id. at 391, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Connick, 131 U.S. at 1359 (citation omitted). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the *training in this particular area was deficient and likely to cause injury*.'" Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005) (emphasis added). Plaintiffs simply have not carried that burden.

Finally, on the issue of municipal liability, Plaintiffs string cite a number of (mostly federal) cases which they claims support their position that White County tolerates civil rights violations. However, the burden is on Plaintiffs, not this Court, to establish their claims, and it is not this Court's duty to scour the record in each of those cases to determine the causes of action and

outcome. See Chen v. Holder, ___ F.3d ___, 2013 WL 6482542 at *2 (7th Cir. Dec. 11, 2013) ("our system is heavily dependent on the parties' lawyers for evidence, research, and analysis," and courts are "neither authorized nor equipped to write a lawyer's brief for him").

Nevertheless, even a cursory review shows that most of the cases cited appear to be inapposite: Gillan v. White County, No. 2:06-00038 (M.D. Tenn. 2006) admittedly arose before Sheriff Shoupe took office and, in any event, was a sexual assault case by an errant deputy; Cope v. White County, No. 2-06-0082 (M.D. Tenn. 2006) was an allegedly wrongful detention and strip search case; Farris v. Shoupe, No. 2:11-00072 (M.D. Tenn. 2011) was an allegedly wrongful termination based upon political affiliation case; Price v. Shoupe, No. 2-12-00072 (M.D. Tenn. 2012) was a *pro se* prisoner case alleging the failure to properly treat chronic back pain; Margeson v. White County, No. 2-11-0052 (M.D. Tenn. 2012) is this case and so could not have been notice of anything; Kress v. Gov't of White County, 2:12-0001 (M.D. Tenn. 2012) was a wrongful arrest case; Roberson v. Shoupe, 2:12-0001 (M.D. Tenn. 2012) was a deliberate indifference and custodial housing case; and Luna v. White County, No. CC2434 (Cir. Ct.) was a case concerning prolonged detention without verification of identity. This leaves at best two cases involving excessive force in the field, but even "[a] handful of isolated excessive force complaints occurring several years before the relevant conduct do not establish a 'pattern or practice' of condoning such activity." Estate of Hickman v. Moore, 2012 WL 4857037 at *8 (6th Cir. Oct. 15, 2012).

## B.  State Law Claims

In Count III of the Complaint, Plaintiffs bring state law claims for negligence, assault and battery, and the intentional and negligent infliction of emotional distress against the individual Defendants and further allege that White County is liable for these claims under the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101 *et seq.*  In Count IV,

Plaintiffs claim that White County is liable for the action of its deputies under Tenn. Code Ann. § 8-8-302.

Turning first to the state law claims against White County, it is clear that White County is entitled to immunity under the TGTLA on Plaintiffs' claims sounding in negligence. "The TGTLA removes immunity for 'injury proximately caused by a negligent act or omission of any employee within the scope of his employment,' but provides a list of exceptions to this removal of immunity." Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010) (quoting Tenn. Code Ann. § 29-20-205)). "Injuries that "arise[ ] out of . . . civil rights" are one such exception, that is, sovereign immunity continues to apply in those circumstances." Id. Tennessee courts construe "'civil rights' under section 29-20-205 as including claims arising under 42 U.S.C. § 1983 and the United States Constitution, id., and a "negligence claim falls within this exception where 'the same circumstances giv[e] rise" to both the negligence and civil rights claims.'" Partee v. City of Memphis, 449 F. App'x 444, 448 (6th Cir. 2011) (citing Johnson, 617 F.3d at 872).

Here, the circumstances which give rise to Plaintiffs' civil rights claims also give rise to their negligence and negligent infliction of emotional distress claims. As such, the Court finds that White County is entitled to immunity, and summary judgment will be granted on Plaintiffs' claims sounding in negligence.

The same, however, cannot be said of Plaintiffs' intentional tort claims in light of Tenn. Code Ann. § 8-8-302, and that statute's interplay with the TGTLA. That section provides:

> Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

In Swanson v. Knox Cnty., 2007 WL 4117259 (Tenn. Ct. App. Nov. 20, 2007), the Tennessee Court

of Appeals surveyed the law in this area and wrote:

> . . . We begin with O'Neal v. DeKalb Co., 531 S.W.2d 296 (Tenn. 1975), in which the Tennessee Supreme Court noted that actions for *misconduct* of deputies are brought under Tenn. Code Ann. § 8-8-302 and actions for *negligence* are brought under the provisions of the [TGLA].
>
> Later, the Supreme Court in Jenkins v. Loudon Co., 736 S.W.2d 603 (Tenn. 1987) examined the interplay between the GTLA and Tenn. Code Ann. §§ 8-8-301, *et seq.* The Court stated that "generally no inconsistency exists between the scope of the remedies provided by the GTLA for certain unintentional torts and that of Tenn. Code Ann. §§ 8-8-301, *et seq.*, for the official misconduct of deputies, except to the extent that these latter statutes could extend to actions for negligence." Id. at 610. The Court concluded that the "general provisions of the GTLA do not supercede the specific provisions of Tenn. Code Ann. §§ 8-8-301, *et seq.*, as they relate to misconduct of sheriff's deputies, except to the extent that Tenn. Code Ann. §§ 8-8-301, *et seq.*, could extend to actions for negligence under Tenn. Code Ann. § 29-20-205." Id. at 609. Stated another way, the Court ruled that the GTLA supercedes Tenn. Code Ann. §§ 8-8-301, *et seq.*, as it relates to actions based on negligence, but Tenn.Code Ann. §§ 8-8-301, *et seq.*, controls as to suits for misconduct of officers.

(Id. at *4 (italics in original). Thus, a plaintiff may "recover from a governmental entity for the intentional misconduct of a deputy under this statute" if "'the misconduct occurred while the deputy was acting by virtue of or under color of his office.'" Currie v. Haywood Cnty., 2011 WL 826805 at *3 (Tenn. Ct. App. Mar. 10, 2011) (citation omitted).

In this case, Defendants do not argue that the deputies were not acting under color of their office when they shot Mr. Margeson. Accordingly, summary judgment as to White County on Plaintiffs claims for assault and battery and the intentional infliction of emotional distress will be denied.

Finally, with respect to the state law claims against the individual deputies, Defendants move for summary judgment, arguing that "the Sixth Circuit has previously held that Tennessee law provides qualified or good faith immunity of government employees for state law torts." (Docket

No. 36 at 24 (citing <u>Willis v. Neal</u>, 247 F. App'x 738, 745 (6th Cir. 2007)).  This is true, but it presupposes that the Court would find all Defendants entitled to qualified immunity.  The Court has not done so with respect to Defendants Lynch, Williams, and Isom, and the state law claims will remain pending as to them.  <u>See</u> <u>Griffin v. Hardrick</u>,  604 F.3d 949, 956 (6th Cir. 2010) (citation omitted) ("'whether the analysis concerns whether an officer violated a plaintiff's constitutional rights by using excessive force or whether the analysis concerns whether an officer committed state-law battery by using force that was 'clearly excessive,' the same principles . . . are applied.'").

## IV. <u>CONCLUSION</u>

In accordance with the foregoing, and by separate Order entered contemporaneously herewith, the Court will grant in part, and deny in part, Defendants' Motion for Summary Judgment.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

21